ORAL ARGUMENT NOT YET SCHEDULED
Nos. 24-1188 (lead), 24-1191, 24-1192

# In the United States Court of Appeals for the District of Columbia Circuit

---

NATIONAL ASSOCIATION OF MANUFACTURERS
& AMERICAN CHEMISTRY COUNCIL, *Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY & LEE ZELDIN,
*in his official capacity as EPA Administrator*, *Respondents*.

---

THE CHEMOURS COMPANY FC, LLC, *Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY & LEE ZELDIN,
*in his official capacity as EPA Administrator*, *Respondents*.

---

On Petition for Review of a Final Rule of the Environemental
Protection Agency, 89 Fed. Reg. 32,532 (Apr. 26, 2024)

---

## NATIONAL ASSOCIATION OF MANUFACTURERS, AMERICAN CHEMISTRY COUNCIL, AND THE CHEMOURS COMPANY FC, LLC'S RESPONSE TO EPA'S MOTION FOR PARTIAL VACATUR

---

Allon Kedem
Joel M. Gross
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202.942.5000
allon.kedem@arnoldporter.com

*Counsel for Petitioner in
No. 24-1192*

Tobias S. Loss-Eaton
Cody M. Akins
Leena Dai
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com

*Counsel for Petitioners in
No. 24-1191*

(Additional counsel listed on inside cover)

Michael B. Kimberly
WINSTON & STRAWN LLP
1901 K Street NW
Washington, DC 20006
(202) 282-5096
mkimberly@winston.com

*Counsel for Petitioners in
No. 24-1191*

# TABLE OF CONTENTS

Table of Authorities ........................................................................ii

Glossary ........................................................................................iv

Introduction ...................................................................................1

Argument .......................................................................................2

I.     The regulatory determinations, goals, and levels for the
       Hazard Index and Index Substances were promulgated
       without proper procedure .....................................................2

II.    The Hazard Index is also substantively unlawful. .........................6

       A.     EPA cannot regulate mixtures through a multi-
              contaminant index. ....................................................6

       B.     The Hazard Index is not supported by substantial
              evidence of occurrence at levels of public health
              concern. ...................................................................9

III.   Vacatur is appropriate. .......................................................13

Conclusion ....................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States*,
   572 U.S. 844 (2014) ................................................................. 7

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
   583 U.S. 416 (2018) ................................................................. 5

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ................................................................... 14

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017) ................................................................... 2

*Hibbs v. Winn*,
   542 U.S. 88 (2004) ................................................................... 7

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ......................................................... 9, 13

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
   70 F.4th 582 (D.C. Cir. 2023) ................................................. 13

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985) ................................................................. 3

*Newman v. FERC*,
   27 F.4th 690 (D.C. Cir. 2022) .................................................. 8

*Pulsifer v. United States*,
   144 S. Ct. 718 (2024) ............................................................... 3

*Russello v. United States*,
   464 U.S. 16 (1983) ................................................................... 4

*Shinn v. Ramirez*,
   142 S. Ct. 1718 (2022) ............................................................. 8

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ................................................................... 9

*Ysleta Del Sur Pueblo v. Texas,*
142 S. Ct. 1929 (2022) ........................................................... 7

**Statutes**

42 U.S.C. § 300f(6) .................................................................. 7

§ 300g-1(b)(1)(A) ................................................. 9, 11, 13

§ 300g-1(b)(1)(B) ............................................. 3, 4, 9, 13

§ 300g-1(b)(1)(E) ...................................................... 3, 4

§ 300g-1(b)(3)(A) ........................................................ 13

§ 300g-1(b)(4)(C) ........................................................... 8

§ 300g-1(b)(6) ................................................................ 8

§ 300g-1(b)(9) .............................................................. 14

**Legislative History**

H.R. Rep. No. 104-741 (1996) .............................................. 11

**Other Authorities**

89 Fed. Reg. 32532 (Apr. 26, 2024) .................................... 5, 11

*American Heritage Dictionary of the English Language* (5th
ed. 2022) ............................................................................. 7

## GLOSSARY

| | |
|---|---|
| EPA (the agency) | Environmental Protection Agency |
| HFPO-DA | hexafluoropropylene oxide dimer acid |
| Index Substances | PFHxS, PFBS, PFNA, and HFPO-DA |
| a Level | maximum contaminant level |
| a Goal | maximum contaminant level goal |
| PFBS | perfluorobutanosulfonic acid |
| PFHxS | perfluorohexanesulfonic acid |
| PFNA | perfluorononanoic acid |
| SDWA (the Act) | Safe Drinking Water Act |

## INTRODUCTION

The Court should grant EPA's motion for partial vacatur. The Safe Drinking Water Act requires EPA to regulate through a specific, sequential process—a meticulous procedure even by administrative-law standards. SDWA's stepwise, deliberate procedure is designed to ensure that the resulting regulations fully reflect the best available science and robust public input, and that the agency focuses on the highest priority national drinking water issues.

EPA breached SDWA's procedural mandate by collapsing multiple steps that Congress directed be taken in sequence. That alone warrants vacatur, as EPA now explains.

But this rush to regulate also produced substantive flaws. EPA lacks statutory authority to regulate a mixture of contaminants through a multi-contaminant "index," as it did here. EPA also ignored defects in its occurrence data. And even according to that flawed data, when these mixtures appear in drinking water, they are almost always below the level at which EPA itself says they could present health concerns. Despite these problems, EPA rushed out regulations before the last presidential election.

EPA's procedural error increased compliance costs and limited opportunities for public input and deliberation. The regulations' substantive flaws, which cannot be fixed on remand, simply bolster the case for vacatur.

## ARGUMENT

## I. The regulatory determinations, goals, and levels for the Hazard Index and Index Substances were promulgated without proper procedure.

As EPA now explains, SDWA does not permit the agency to simultaneously propose to regulate a particular contaminant and propose Goals and Levels for that contaminant. EPA rightly acknowledges that its prior view "was in error and inconsistent with the 'single, best meaning' of the statute." EPA Mot. 10.

A.   In particular, EPA's prior view requires abandoning the "usual presumption that identical words used in different parts of the same statute carry the same meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017) (cleaned up). That is because—as EPA has acknowledged all along—reading the Act to permit simultaneous proposals requires giving the phrase "determination to regulate" two different meanings in successive statutory clauses. *See* EPA Br. 30; EPA Mot. 12.

2

The relevant sentence reads: "[EPA] shall propose the maximum contaminant level goal and national primary drinking water regulation for a contaminant not later than 24 months after *the determination to regulate under subparagraph (B)*, and may publish such proposed regulation concurrent with *the determination to regulate*." 42 U.S.C. § 300g-1(b)(1)(E) (emphases added). The agency previously read the first use to refer to the *final* determination to regulate but the second to refer to a *preliminary* determination. EPA Br. 30; EPA Mot. 12.

That is improper. The canon of consistent usage is strongest when "applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize." *Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024). "[D]etermination to regulate"—a term of art in SDWA—is such a term. What's more, on EPA's prior reading Congress gave that "heft[y]" term different meanings not in related sections or subsections of SDWA, but in a single sentence. *Contra Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164–65 (1985).

Nothing in the statute supports that bizarre reading. It is simply not the case that clause (b)(1)(B)(iii)—part of the "subparagraph (B)" cross-referenced in the relevant sentence—"clearly" uses the phrase

"determination for a contaminant" to refer to a preliminary determination to regulate. EPA Br. 31. The full text of that clause refers to a "determination for a contaminant *under clause (ii)*," and clause (b)(1)(B)(ii) in turn refers to "determinations of whether or not to regulate ... contaminants" made "*after* notice of the preliminary determination"—that is, final determinations.

The truth is that Congress studiously observed the distinction between preliminary and final determinations to regulate. The only time Congress used the word "determination" to refer to the listing of a contaminant which "may require regulation," it also used the qualifier "preliminary." § 300g-1(b)(1)(B)(i)(I), (ii)(I). Had Congress intended "determination to regulate" in the second clause of § 300g-1(b)(1)(E) to refer to EPA's preliminary determination, "it presumably would have done so expressly[,] as it did" a few paragraphs earlier. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

Nor is it true that, if the "concurrent with" clause of paragraph (b)(1)(E) doesn't refer to a preliminary determination, then it is "superfluous, because there is nothing else in SDWA or administrative law generally that" would prohibit EPA from concurrently publishing a final

determination to regulate and proposed Goals and Levels. *See* EPA Br. 31. Congress "could well have added" the "concurrent with" clause in a "general excess of caution"—"to 'remove any doubt' as to things not particularly doubtful in the first instance." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 435 (2018). It makes sense to read a statute to avoid superfluity among its own provisions—but not to adopt a strained reading because explicit statutory language is supposedly redundant with unstated background principles.

For these reasons and those raised by EPA in its motion, SDWA demands a two-step procedure, and EPA's decision to spurn that process was unlawful.

B.    Petitioners also agree that EPA's procedural error was prejudicial. Had EPA followed the Act's mandatory procedure, it may not have finalized its proposed Goals and Levels in light of the additional public input, as EPA ably explains. Mot. 18–19.

The agency also may not have finalized its regulatory determination for the Index Substances and Hazard Index. Simultaneously proposing to regulate and proposing specific Goals and Levels likely had a sort of lock-in effect. EPA would not have gone through the trouble of coming

up with proposed Goals and Levels if it weren't set on regulating in the first place. So EPA's procedural error taints every aspect of the final Rule with respect to the Index Substances and Hazard Index. The determination to regulation, Goals, and Levels should all be vacated.

## II.    The Hazard Index is also substantively unlawful.

Procedural problems aside, an additional reason supports vacating the regulatory determination, Goal, and Level for the Hazard Index: EPA's decision to regulate the Hazard Index has substantive defects. First, EPA lacks statutory authority to regulate mixtures of substances through a multi-contaminant index. Second, EPA's regulatory determination is not supported by substantial evidence of occurrence at levels of public health concern.

### A.    EPA cannot regulate mixtures through a multi-contaminant index.

As Petitioners have explained, SDWA authorizes EPA to regulate only individual contaminants, not mixtures of them. Industry Br. 31–33. The Act consistently refers to contaminants in the singular form; Congress used the phrase "mixture" in related statutes when it intended to confer such regulatory authority; and the legislative history repeatedly speaks of setting a Goal and Level for "each" contaminant. *See id.*

To be sure, the Act defines "contaminant" as "any … substance *or matter* in water." § 300f(6) (emphasis added). But "matter" cannot be read broadly to include mixtures of substances. Indeed, "matter" cannot be read to encompass "substances" at all, because doing so would "violat[e] the rule against 'ascribing to one word a meaning so broad' that it assumes the same meaning as another statutory term." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022). If "matter" were read broadly, SDWA would not "need the wor[d]" "substance" at all, because "matter," "alone, would do all the necessary work." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

Reading the statutory definition of "contaminant" to cover mixtures would also conflict with the term's ordinary usage. *See Bond v. United States*, 572 U.S. 844, 861 (2014) ("In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition."). A contaminant is "[o]ne that contaminates." *American Heritage Dictionary of the English Language* (5th ed. 2022). In ordinary usage, we would not say that a mixture of multiple substances that can each "contaminate" (say, lead and arsenic) are a single

"contaminant" simply because they co-occur. In other words, water with both PFHxS and PFNA—each of which can occur on its own, and each of which can independently (in EPA's view) "contaminate" water—has two "contaminants," not one.

A contrary reading would also "countenanc[e] an end-run around" one of SDWA's central requirements. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1738 (2022). The Act requires EPA to cost-justify—or at least explain its decision not to cost-justify—each Level that it selects. *See* § 300g-1(b)(4)(C), (b)(6). But that restriction vanishes if EPA can simply bundle unjustified contaminants together with a strongly justified one and call it a "mixture." "The risk of such end-runs around the core function" of SDWA's cost-benefit rules "confirms" that the Act does not permit EPA to regulate mixtures of substances with a single Level. *See Newman v. FERC*, 27 F.4th 690, 703 (D.C. Cir. 2022).

It is no answer that EPA has regulated mixtures of substances before. *See* EPA Br. 28–29. EPA has never actually grappled with the text of SDWA in deciding to regulate a group of chemicals. Just as a "drive-by jurisdictional ruling" has "no precedential effect," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998), the fact that EPA reached a

8

particular outcome without considering its authority to do so has no bearing on SDWA's proper interpretation. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (*Skidmore* deference depends on the "thoroughness" of the agency's consideration of an issue).

The Act does not permit EPA to regulate multiple contaminants with a single Level, so the Hazard Index is unlawful.

### B. The Hazard Index is not supported by substantial evidence of occurrence at levels of public health concern.

EPA may not regulate a contaminant unless it "occur[s]" or is "substantial[ly] likel[y]" to "occur in public water systems with a frequency and at levels of public health concern." § 300g-1(b)(1)(A)(ii), (b)(1)(B)(ii)(II). EPA's own occurrence data—which is flawed to begin with—confirms that combinations of the Index Substances fail this test. Instead, EPA relies on sparse and localized data, which cannot justify nationwide regulation.

1. To start, EPA's occurrence data has significant sampling errors that undermine the data's reliability. EPA evaluated occurrence at the sample and system level, but did not specify whether sample counts represent unique locations or include multiple samples from the same location. *See* EPA, *2024 Per- and Polyfluoroalkyl Substances (PFAS)*

9

*Occurrence and Contaminant Background Support Document*, EPA-HQ-OW-2022-0114-3086, at 236–46. Evaluating multiple samples from the same location within a system could overestimate the frequency of co-occurrence.

Moreover, the co-occurrence data presented at the system level for detection of any Index Substances show wide variability among states. The two states with the most systems tested, Michigan and Ohio, show a low frequency of detection of any Index Substances (i.e., approximately 5% and 2%, respectively) compared to states with fewer systems tested. *See id.* at 241–42. This discrepancy suggests that data from states with sparser samples may not be representative of occurrence in those states.

EPA also inexplicably used different data sets for evaluating actual co-occurrence and estimating national occurrence. In the former, EPA focused exclusively on the 18 states that conducted "non-targeted" (*i.e.*, random) sampling campaigns. *See id.* at 240–42. That makes sense: Data from areas of "known or potential PFAS contamination" "may not necessarily be representative of levels found" in all water systems throughout the state. *Id.* at 23. But then, when developing its national occurrence model, EPA changed tack and included "samples from 28 state

datasets"—including those that used targeted sampling. *Id.* at 247. EPA never explained why targeting sampling results were too unreliable for its occurrence analysis but not its occurrence model.

2.    Even assuming the accuracy of the underlying data, the record does not show that these substances occur at levels of public health concern. EPA's core failing is its exclusive focus on raw occurrence, without any meaningful analysis of how often mixtures of the Hazard Index substances occur at levels of public health concern. EPA's only conclusion is that some combinations of Index Substances are found in drinking water. But the statute demands that a contaminant occur both "with a frequency *and* at levels of public health concern." § 300g-1(b)(1)(A)(ii) (emphasis added). Congress, in short, directed EPA to "target" "scarce Federal, State, and local resources" at "problems of greatest public health concern," not marginal or isolated ones. H.R. Rep. No. 104-741 (1996).

EPA's sample-level data show just how rarely Index mixtures exceed the Hazard Index's 1.0 threshold—below which, in EPA's words, "no known or anticipated adverse effects on the health of persons occur." 89 Fed. Reg. at 32533. A mere 1.8% of over 47,000 total samples exceeded the Hazard Index threshold. Most states had fewer than 4% of samples

11

over the threshold, and even that low figure is skewed by a handful of statistical outliers. Occurrence Background, *supra*, at 220–25. For instance, Colorado's exceedance rate for 3 analytes dropped from 35.06% in 2013–2017 to just 0.34% for 4 analytes in 2020, but EPA still included the older data. *Id.* at 221. In short, exceedances are rare and often attributable to stale or extremely limited data.

The results are no more compelling when analyzed by percentage of public water systems. Of the over 12,000 systems sampled, only 214—or just 1.8%—reported Hazard Index values above 1. *Id.* at 226–35; *see also* AWWA Comment, EPA-HQ-OW-2022-0114-1759, at 19 (describing study demonstrating that for certain Index Substance combinations, zero water systems had occurrences over the health-based water concentration). Table 13 of the Rule's preamble confirms that in all 15 states with available data, fewer than 3.5% of systems had exceedances, and in over half of those states, fewer than 1% of water systems registered Hazard Index levels over 1. 89 Fed. Reg. at 32595. These are not numbers indicative of a pervasive or urgent national threat.

EPA cannot lower the regulatory bar by invoking SDWA's supposed "health protective nature." *Contra* EPA Br. 38, 61–62. Nothing in the Act

12

permits EPA to put a thumb on the scale in favor of regulation or to assume worst-case scenarios. Nor is EPA's interpretation of the relevant language entitled to deference just because it "happens to implicate a technical matter." *Loper Bright*, 144 S. Ct. at 2267.

Rather, SDWA demands that EPA find actual or "substantially like[ly]" contaminant occurrence, § 300g-1(b)(1)(A)(ii), and to regulate with a sober view of "the best available, peer-reviewed science" and the "best available public health information," § 300g-1(b)(1)(B)(ii)(II), (b)(3)(A)(i). Those twin commands, even more so than similar directives in other environmental statutes, bar EPA from "distorting the decisionmaking process by overemphasizing highly speculative harms." *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989)).

## III. Vacatur is appropriate.

Petitioners agree with EPA that vacatur is appropriate because the agency's errors are serious and vacatur would not be disruptive. EPA Mot. 20–22. Petitioners add that, absent vacatur, interested parties like Intervenors are sure to invoke SDWA's unusual "anti-backsliding"

provision in a bid to bar EPA from revisiting the rule. That provision states that any revision of a national primary drinking water regulation "shall maintain, or provide for greater, protection of the health of persons." § 300g-1(b)(9).

To be sure, Petitioners do not believe—and are aware of no authority suggesting—that the anti-backsliding provision prevents EPA from revisiting an unlawful rule. It is one thing for Congress to restrain an agency's power to revise rules just because it has reevaluated the facts; it would be something else entirely for Congress to bind the agency to a rule that was invalid in the first place. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 46 (2020) (Thomas, J., concurring and dissenting in part) ("The decision to rescind an unlawful agency action is *per se* lawful."). Even so, if EPA rescinds the regulations and reconsiders the regulatory determinations for the Hazard Index and the Index Substances, as it plans to do, *see* EPA Mot. 8, interested parties like Intervenors will surely argue that EPA has violated the anti-backsliding provision.

Vacatur is thus appropriate to ensure a clean slate for EPA's reconsideration process. The results of that process will be subject to judicial review in the ordinary course. As EPA rightly notes, "finalizing a

potential new rule under the cloud of a disputed legal issue would only lead to more litigation." EPA Mot. 3.

## CONCLUSION

The Court should grant EPA's motion and vacate the portion of the Rule finalizing regulatory determinations, Goals, and Levels for the Index Substances and Hazard Index.

<div style="display: flex; justify-content: space-between;">

<div>

Allon Kedem
Joel M. Gross
ARNOLD & PORTER KAYE
   SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202.942.5000
allon.kedem@arnoldporter.com

*Counsel for Petitioner in
No. 24-1192*

</div>

<div>

Respectfully submitted,

*/s/ Tobias S. Loss-Eaton*
Tobias S. Loss-Eaton
Cody M. Akins
Leena Dai
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com

Michael B. Kimberly
WINSTON & STRAWN LLP
1901 K Street NW
Washington, DC 20006
(202) 282-5096
mkimberly@winston.com

*Counsel for Petitioners in
No. 24-1191*

</div>

</div>

15

## CERTIFICATE OF COMPLIANCE

This response complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. The response complies with Rule 27(d)(2) because it contains 2,786 words, excluding the sections listed in Rule 32(f).

## CERTIFICATE OF SERVICE

I certify that on September 26, 2025, a copy of this motion was electronically filed with the Clerk of the Court using the CM/ECF System, which will notify all registered CM/ECF users.

*/s/ Tobias S. Loss-Eaton*
Tobias S. Loss-Eaton
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8427
tlosseaton@sidley.com