**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| AMERICAN WATER WORKS ASSOCIATION and ASSOCIATION OF METROPOLITAN WATER AGENCIES, | ) ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Lead Case No. 24-1188 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE M. ZELDIN, in his official capacity as Administrator, United States Environmental Protection Agency, | ) ) ) ) ) ) ) | consolidated with Nos. 24-1191, 24-1192 |
| Respondents. | ) ) ) | |

**RESPONDENT-INTERVENORS' OPPOSITION TO THE ENVIRONMENTAL PROTECTION AGENCY'S MOTION FOR PARTIAL VACATUR AND RESPONDENT-INTERVENORS' MOTION FOR LEAVE TO FILE A REVISED AND EXPANDED BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...............................................................................1

BACKGROUND ................................................................................1

ARGUMENT .....................................................................................5

I.   The Merits Panel Should Resolve EPA's Motion ...........................5

    A.   Resolving EPA's Motion Requires a Ruling on the Merits....................6

    B.   There Is No Justification for Bifurcating Adjudication of the Issues Raised in EPA's Motion from the Rest of the Case.................................7

II.  There Is No Error That Justifies Vacating Any Portion of the Rule ..............9

    A.   EPA Does Not Identify Any Procedural Error in Its Promulgation of the Index PFAS Determinations .......................................................9

    B.   EPA's Process for Promulgating the Goals and Standards Was Permissible Under the Act ........................................................10

        1.   Section 300g-1(b)(1)(B)(ii)..........................................................11

        2.   Section 300g-1(b)(1)(B)(ii)(II) ....................................................12

        3.   Section 300g-1(b)(1)(B)(ii)(III) ...................................................12

        4.   Section 300g-1(b)(1)(E) .............................................................13

        5.   EPA's and Petitioners' interpretation is not the best reading of the Act ..............................................................................17

III. Even If There Were a Procedural Error, It Was Harmless...........................19

IV.  Even If There Were a Procedural Error and It Were Not Harmless, Vacatur Is Not Justified........................................................................21

    A.   Vacatur Would Threaten Public Health ................................................22

    B.   The Alleged Error Is Not Serious........................................................23

C.   Vacatur Would Be Disruptive ..................................................27

V.  Due to EPA's Changed Position, the Court Should Grant Intervenors Leave to File a Revised and Expanded Brief ..........................................30

CONCLUSION ..........................................................................35

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................37

CERTIFICATE OF SERVICE ...............................................................38

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal v. NRC*,
    988 F.2d 146 (D.C. Cir. 1993) .................................................... 21, 22, 24, 27, 29

*Am. Great Lakes Ports Ass'n v. Zukunft*,
    301 F. Supp. 3d 99 (D.D.C. 2018) ............................................................... 22, 28

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
    247 F.3d 1241 (D.C. Cir. 2001) ..............................................................................21

*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ...............................................................................25

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) ............................................................... 7, 19, 21

*Cook v. Trump*,
    No. 25-cv-2903-JMC, 2025 WL 2607761 (D.D.C. Sept. 9, 2025) .............. 10-11

*EMC Corp. v. Hewlett-Packard Co.*,
    No. 00-cv-40188-NMG, 2003 WL 25782750 (D. Mass. Sept. 12, 2003) ...........16

*Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt*,
    852 F. Supp. 32 (D.D.C. 1994) ............................................................................23

*First Am. Discount Corp. v. Commodity Futures Trading Comm'n*,
    222 F.3d 1008 (D.C. Cir. 2000) ...........................................................................19

*Fox Television Stations v. FCC*,
    280 F.3d 1027 (D.C. Cir. 1993) ................................................................... 24, 26

*Global Tel*Link v. FCC*,
    866 F.3d 397 (D.C. Cir. 2017) ............................................................................30

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ..............................................................................................35

*Healthy Gulf v. FERC*,
    107 F.4th 1033 (D.C. Cir. 2024) .........................................................................29

iii

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009)......................................................... 24, 25

*In re Clean Water Act Rulemaking*,
    60 F.4th 583 (9th Cir. 2023) .................................................................6

*INS v. Nat'l Ctr. for Immigrants' Rts.*,
    502 U.S. 183 (1991).............................................................................11

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...................................................................... 10, 18

*Louisiana v. Am. Rivers*,
    142 S. Ct. 1347 (2022).........................................................................6

*McLouth Steel Prods. Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988).........................................................21

*Mexichem Specialty Resins v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015)............................................................6

*Nat. Res. Def. Council v. Regan* ("*NRDC*"),
    67 F.4th 397 (D.C. Cir. 2023)................................................... 4, 7, 27

*Nat'l Wildlife Fed. v. Lujan*,
    928 F.2d 453 (D.C. Cir. 1991)...........................................................30

*North Carolina v. EPA*,
    550 F.3d 1176 (D.C. Cir. 2008)................................................... 22, 23

*Ortiz v. Sec'y of Def.*,
    41 F.3d 738 (D.C. Cir. 1994)............................................................10

*Robers v. United States*,
    572 U.S. 639 (2014)...................................................................... 10, 15

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003)...........................................................21

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
    879 F.3d 1177 (D.C. Cir. 2018).........................................................25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ........................................... 24, 25, 26, 27

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ........................................................21

*Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail v. Fed. R.R. Admin.*,
    40 F.4th 646 (D.C. Cir. 2022) .....................................................21

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ....................................................................30

*Wisc. Cent. Ltd v. United States*,
    585 U.S. 274 (2018) ....................................................................16

*Wisconsin v. EPA*,
    938 F.3d 303(D.C. Cir. 2019) .....................................................21

**Statutes**

5 U.S.C. § 706 .......................................................................................19

42 U.S.C. § 300g-1 ..................................................................... 10, 11, 15

42 U.S.C. § 300g-1(a) ................................................................... 15-16

42 U.S.C. § 300g-1(a)(3) ............................................................... 15-16

42 U.S.C. § 300g-1(b)(1)(B) ..............................................................14

42 U.S.C. § 300g-1(b)(1)(B)(i) ...........................................................12

42 U.S.C. § 300g-1(b)(1)(B)(ii) ...................................... 11, 13, 14, 15, 17

42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) ................................................... 9, 11

42 U.S.C. § 300g-1(b)(1)(B)(ii)(II) .............................................. 11, 12, 17

42 U.S.C. § 300g-1(b)(1)(B)(ii)(III) .............................................. 11, 12, 13

42 U.S.C. § 300g-1(b)(1)(B)(iii) .................................................. 12, 13, 17

42 U.S.C. § 300g-1(b)(1)(E) ............................... 9, 13, 14, 15, 16, 17, 18, 28

42 U.S.C. § 300g-1(b)(13)(F) .......................................................... 15-16

42 U.S.C. § 300g-1(b)(8) ................................................................ 15-16

42 U.S.C. § 300g-1(b)(9) ...................................................... 4, 7, 14, 27

42 U.S.C. § 300g-2(a)(1) ..................................................................28

42 U.S.C. § 300h-2 ...........................................................................16

42 U.S.C. § 300j-19b .......................................................................16

42 U.S.C. § 300j-6 ...........................................................................16

42 U.S.C. § 300j-7 ...........................................................................16

**Regulations**

88 Fed. Reg. 18,638 (proposed Mar. 29, 2023) ......................................9

89 Fed. Reg. 32,532 (Apr. 26, 2024) ............................... 2, 9, 10, 14, 19

Wash. Admin. Code § 246-290-310(7)(d) ............................................28

**Other Authorities**

*Concurrent*, Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/concurrent ...............................................16

D.C. Cir. *Handbook of Practice and Internal Procedures* ......................5

D.C. Circuit Rule 28(d)(2) ........................................................... 3, 31

*EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS,*
    EPA (May 14, 2025), https://www.epa.gov/newsreleases/epa-announces-it-will-
    keep-maximum-contaminant-levels-pfoa-pfos ......................................4

EPA, *Occurrence and Contaminant Background Support Document for the Final
    PFAS National Primary Drinking Water Regulation* (2024),
    https://www.epa.gov/system/files/documents/2024-04/updated-technical-
    support-document-on-pfas-occurrence_final508.pdf .........................22

EPA, *Responses to Public Comments* (2024),
    https://www.epa.gov/system/files/documents/2024-04/pfas-comment-response-
    document_final-508_v2.pdf...........................................................26

Federal Rule of Appellate Procedure 30(c)(2)(B) .....................................................31

*Simultaneous*, Merriam-Webster Dictionary, http://merriam-webster.com/dictionary/simultaneous ...............................................................16

## INTRODUCTION

Petitioners challenge a rule promulgated by Respondent U.S. Environmental Protection Agency ("EPA") establishing limits on six toxic PFAS chemicals in drinking water. Following a change in presidential administration, EPA has abandoned its defense of the rule's limits on four of those chemicals and EPA's determinations to regulate them under the Safe Drinking Water Act (the "Act"). EPA seeks partial vacatur of the rule prior to full adjudication of the merits based on an alleged procedural error that is the basis for one of Petitioners' claims. Respondent-Intervenors ("Intervenors") oppose EPA's Motion for Partial Vacatur. Dkt. No. 2134523 ("EPA Mot.").

Additionally, due to EPA's partially abandoning its defense of the rule, Intervenors respectfully move for leave to file a revised and expanded brief of 18,200 words. A revised brief is necessary to mitigate prejudice to Intervenors from EPA's changed position in the middle of merits briefing and to ensure that the Court has complete briefing on all contested issues. Petitioners oppose Intervenors' motion and EPA reserves its position and its right to file a response.

## BACKGROUND

Petitioners American Water Works Association and Association of Metropolitan Water Agencies ("Utility Petitioners") and the National Association of Manufacturers, American Chemistry Council, and the Chemours Company

("Industry Petitioners") challenge EPA's rule entitled "PFAS National Primary Drinking Water Regulation," 89 Fed. Reg. 32,532 (Apr. 26, 2024) (the "Rule").

The Rule finalized EPA's determinations to regulate ("Determinations") the per- and polyfluoroalkyl substances ("PFAS") known as HFPO-DA, PFHxS, and PFNA, and mixtures of HFPO-DA, PFBS, PFHxS, and PFNA through a Hazard Index standard. The Rule also finalized EPA's non-enforceable Maximum Contaminant Level Goals ("Goals") and enforceable Maximum Contaminant Levels ("Standards") for PFOA, PFOS, HFPO-DA, PFHxS, PFNA, and mixtures of two or more of HFPO-DA, PFBS, PFHxS, and PFNA (the "Index PFAS").

PFAS are a "class of thousands of synthetic chemicals" used in consumer, commercial, and industrial products due to their ability to "withstand heat and repel water and stains." 89 Fed. Reg. at 32,536. Often called "forever chemicals," PFAS are extremely persistent in the environment and can bioaccumulate in humans and wildlife. *See id.* PFAS exposure is associated with adverse "effects on the liver (*e.g.,* liver cell death), growth and development (*e.g.,* low birth weight), hormone levels, kidney, the immune system (reduced response to vaccines), lipid levels (*e.g.,* high cholesterol), the nervous system, and reproduction, as well as increased risk of certain types of cancer." *Id.* at 32,537. PFAS exposure "may have disproportionate health effects on children." *Id.* Intervenors are environmental and public health groups that advocated for the Rule and their members have been

severely harmed by PFAS drinking water contamination. Cmty. Grps. Intervention Mot. 6-7, Dkt. No. 2062232; NRDC Intervention Mot. 8, 10, Dkt. No. 2062233.

Petitioners filed their two opening briefs on October 7, 2024, seeking vacatur of the entire Rule. Utility Pet'rs' Br. 57, Dkt. No. 2078734 ("Utility Br."); Industry Pet'rs' Br. 60, Dkt. No. 2078731 ("Industry Br."). Among other arguments, Petitioners asserted that EPA violated the Act by proposing and finalizing the Index PFAS Goals and Standards concurrently with its Determinations for the Index PFAS. Utility Br. 18-32; Industry Br. 34-37.

EPA filed its brief on December 23, 2024, defending all aspects of the Rule. Dkt. No. 2091318 ("EPA Br."), at 122. Intervenors filed their brief on January 17, 2025, and likewise defended the entire Rule. Dkt. No. 2094834 ("Intervenors Br."), at 47. Intervenors' brief adopted EPA's brief in full, cross-referenced it extensively, and omitted arguments that EPA covered to comply with D.C. Circuit Rule 28(d)(2).

Petitioners were scheduled to file their reply briefs in February 2025. *See* Scheduling Order, Dkt. No. 2072754 (Sept. 3, 2024). However, on February 7, 2025, EPA filed the first of four unopposed motions to hold this case in abeyance while EPA reconsidered its positions following the change in presidential administration. *See* Dkt. Nos. 2099439 (Feb. 7, 2025), 2109880 (Apr. 8, 2025), 2115469 (May 12, 2025), 2119087 (June 4, 2025).

3

On May 14, 2025, EPA announced its intention to retain its Standards for PFOA and PFOS (but initiate a new rulemaking to delay their implementation). *See EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS*, EPA (May 14, 2025), https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos. EPA also announced "its intent to rescind the regulations and reconsider the regulatory determinations for" the Index PFAS. *Id.*

EPA's planned rulemaking to eliminate the Rule's Index PFAS provisions runs afoul of twin one-way ratchets that Congress incorporated into the Act. First, the Act "does not permit EPA to withdraw a regulatory determination" after it is finalized. *Nat. Res. Def. Council v. Regan* ("*NRDC*"), 67 F.4th 397, 398 (D.C. Cir. 2023). Second, the Act's "anti-backsliding" provision requires that "each revision [of a Standard] shall maintain, or provide for greater, protection of the health of persons." 42 U.S.C. § 300g-1(b)(9); *see NRDC*, 67 F.4th at 399. In short, the Act precludes EPA from administratively eliminating the Determinations, Goals, and Standards for the Index PFAS. *See* EPA Mot. 20-21 (acknowledging these prohibitions).

On September 11, 2025, EPA filed its Motion for Partial Vacatur, advancing Petitioners' argument that "parts of the rulemaking process were unlawful" and

4

requesting that the Court vacate the Determinations, Goals, and Standards for the Index PFAS based on that purported procedural error. EPA Mot. 1.

## ARGUMENT

EPA's motion should be referred to the merits panel because it requires a merits ruling and raises contested issues that are intertwined with the rest of the case. Ultimately, EPA's motion should be denied because there was no procedural error in EPA's promulgation of the Index PFAS Determinations or Standards. Even if there were an error, it was harmless. And even assuming that there were an error that caused harm, EPA fails to justify vacatur. Indeed, by seeking vacatur for an alleged procedural error EPA asks this Court to do what the Act forbids EPA from doing itself: eliminate final Determinations and Standards for drinking water contaminants.

Finally, to mitigate prejudice to Intervenors from EPA's abandoning its defense of the Index PFAS provisions midway through merits briefing and ensure the Court has full briefing on all contested issues, the Court should grant Intervenors leave to file a revised and expanded merits brief.

## I.    The Merits Panel Should Resolve EPA's Motion

EPA's motion should be referred to the merits panel. *See* D.C. Cir. *Handbook of Practice and Internal Procedures* 31-32. As explained below, the Court may not vacate the Index PFAS provisions without ruling on the merits.

Further, the issues raised by EPA's motion are contested and intertwined with other issues in the case. Segregating them for resolution prior to the merits panel's consideration of full merits briefing would be inefficient and needlessly complicate these proceedings.

### A. Resolving EPA's Motion Requires a Ruling on the Merits

EPA's motion requires a ruling on the merits because the Court may not vacate portions of the Rule without independently determining their legality. "EPA's consent is not alone a sufficient basis … to … vacate a rule. The court is not bound to accept, and indeed generally should not uncritically accept, an agency's concession of a significant merits issue." *Mexichem Specialty Resins v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015). Vacating agency rules without holding them unlawful would permit agencies to "circumvent the rulemaking process through litigation concessions." *Id.* Accordingly, the Ninth Circuit has held that courts lack authority to vacate agency rules without a judicial determination of illegality, *In re Clean Water Act Rulemaking*, 60 F.4th 583 (9th Cir. 2023), and the Supreme Court has suggested it agrees, *see Louisiana v. Am. Rivers*, 142 S. Ct. 1347 (2022) (staying district court order in *In re Clean Water Act Rulemaking* that vacated EPA rule without merits ruling).

Here, vacatur without a merits ruling would be especially improper because it would permit EPA to circumvent the Act's prohibitions on rescission of final

6

Determinations or Standards. As EPA acknowledges, EPA Mot. 20-21, the Act

deprives EPA of authority to rescind Determinations, *NRDC*, 67 F.4th at 404, or

reduce or eliminate the health protections afforded by existing Standards, 42

U.S.C. § 300g-1(b)(9); *see NRDC*, 67 F.4th at 399; *City of Waukesha v. EPA*, 320

F.3d 228, 257 (D.C. Cir. 2003). Vacating the Index PFAS Determinations or

Standards based on EPA's new assertion of procedural error would permit EPA to

accomplish through its about-face in litigation position the very rescissions the

statute forbids.

### B. There Is No Justification for Bifurcating Adjudication of the Issues Raised in EPA's Motion from the Rest of the Case

The validity of the Index PFAS provisions should be resolved by the merits

panel in conjunction with the many other issues in this case after full briefing.

First, the issues in EPA's motion are contested. While EPA is abandoning its

defense of the process it followed to promulgate the Index PFAS Standards,

Intervenors are not. Intervenors are entitled to defend the Index PFAS provisions

regardless of EPA's changed position. *See infra* Point V.

Second, EPA's bid to segregate the issues in its motion from the other merits

issues would complicate these proceedings and potentially waste the Court's

resources. EPA seeks an immediate ruling that the Index PFAS provisions are

unlawful based solely on alleged procedural error. *See* EPA Mot. 1 ("EPA agrees

with petitioners that parts of the rulemaking *process* were unlawful and parts of the

7

Rule are thus invalid.") (emphasis added); *id.* at 8 (explaining that EPA is abandoning its argument that EPA followed the proper procedure in promulgating these parts of the Rule). But Petitioners advanced multiple additional arguments for invalidating these parts of the Rule. *See* Utility Br. 33-57; Industry Br. 14-60. Therefore, if a motions panel considers and rejects EPA's new procedural argument, a different panel would have to consider whether the same parts of the Rule are unlawful for other reasons. The Court should not indulge this inefficiency.

Finally, there is no reason for haste in resolving the issues in EPA's motion. EPA's only attempt to suggest otherwise is to point to a supposed "cloud" of uncertainty looming over its recently announced rulemaking to rescind the Index PFAS provisions. EPA Mot. 3. But uncertainty is not what EPA seeks to dispel. As its motion signals, EPA seeks to remove through a quick vacatur order from this Court the barriers to that rulemaking erected in the Act's standard-setting and anti-backsliding provisions. *See id.* at 20-21 (acknowledging that the Act prohibits administrative rescission of Determinations or Standards). The Court should not facilitate EPA's circumvention of those statutory limits on EPA's authority. Moreover, referring EPA's motion to the merits panel would not prejudice Petitioners, who will not have regulatory certainty until the full case is resolved. That can occur more expeditiously through a single panel's consideration of all issues.

## II.    There Is No Error That Justifies Vacating Any Portion of the Rule

### A. EPA Does Not Identify Any Procedural Error in Its Promulgation of the Index PFAS Determinations

EPA's Motion does not argue that there is any procedural requirement for the Index PFAS Determinations that EPA purportedly violated because there is none. EPA properly gave "notice of the preliminary determination[s]" with a 60-day "opportunity for public comment," considered and responded to comments, and then made "determinations of whether or not to regulate" the Index PFAS. 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I); *see generally* PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638 (proposed Mar. 29, 2023) (proposed rule); 89 Fed. Reg. 32,532 (final rule). Section 300g-1(b)(1)(E) addresses the timing only for proposed and final Goals and Standards; it does not place any timing restrictions on preliminary or final determinations to regulate.

Moreover, as EPA correctly argued in its proof brief, "EPA's actions at the various steps of the regulatory process are severable," meaning any error "in setting the Standard for a contaminant … cannot justify vacatur of … the regulatory determination for that contaminant." EPA Br. 120; *see* 89 Fed. Reg. at 32,731-32 (stating that each Standard and Goal is independent and severable). Having alleged no procedural error in the Index PFAS Determinations, EPA fails to identify any basis for vacating them.

9

## B. EPA's Process for Promulgating the Goals and Standards Was Permissible Under the Act

During the rulemaking process, EPA correctly determined that the Act allows "concurrent processing of a preliminary determination with a proposed rule," such that EPA may "issue a preliminary determination to regulate a contaminant and a proposed [Goal and Standard] addressing that contaminant concurrently and request public comment at the same time." 89 Fed. Reg. at 32,538. This is the best reading of 42 U.S.C. § 300g-1 because it is the only interpretation that gives the phrase "determination to regulate" a consistent meaning throughout this provision and gives effect to material variation in Congress's word choices. Petitioners' contrary interpretation, now joined by EPA, runs afoul of basic canons of statutory construction.

The Court exercises "independent judgment in deciding whether an agency has acted within its statutory authority," using "traditional tools of statutory construction" to find the statute's "single, best meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 403, 412 (2024). "Generally, identical words used in different parts of the same statute are presumed to have the same meaning." *Robers v. United States*, 572 U.S. 639, 643 (2014) (citation modified). Conversely, "when Congress 'employs different words, it usually means different things.'" *Cook v. Trump*, No. 25-cv-2903-JMC, 2025 WL 2607761, at *8 (D.D.C. Sept. 9, 2025) (quoting *Ortiz v. Sec'y of Def.*, 41 F.3d 738, 740 (D.C. Cir. 1994)), *stay*

10

*pending appeal denied*, No. 25-5326, 2025 WL 2654786 (D.C. Cir. Sept. 15, 2025), *appeal docketed*, No. 25A312 (U.S. Sept. 18, 2025).

Section 300g-1 uses the phrase "determination to regulate" six times and the best reading of this provision is that each usage of this phrase consistently refers to the determination to regulate process, encompassing both the preliminary and final determinations to regulate (or not regulate). *Contra* EPA Mot. 12-16.

### 1.    Section 300g-1(b)(1)(B)(ii)

"Determination to regulate" first appears as the heading of section 300g-1(b)(1)(B)(ii). This section sets forth a process requiring EPA to make "the preliminary determination" for at least five candidate contaminants every five years and, after "opportunity for public comment," make final "determinations of whether or not to regulate." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I). It also specifies the criteria and evidence on which these decisions must be based and establishes a process for determining to regulate contaminants that are not on EPA's candidate list. *Id.* § 300g-1(b)(1)(B)(ii)(II)-(III); *see infra* (detailed discussions of these provisions). The content of section 300g-1(b)(1)(B)(ii) shows that "Determination to regulate" in the section's heading refers to this entire process and is the closest thing to a statutory definition of "determination to regulate." *See INS v. Nat'l Ctr. for Immigrants' Rts.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

11

## 2. Section 300g-1(b)(1)(B)(ii)(II)

The second use of "determination to regulate" says, "A determination to regulate a contaminant shall be based on findings that the criteria of clauses (i), (ii), and (iii) of subparagraph (A) are satisfied." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II). It would be illogical, and there is no textual basis, to conclude that Congress intended for these criteria to apply only to final determinations. Instead, this use of "determination to regulate" refers to the entire process and establishes that both preliminary and final determinations shall be based on the specified criteria.

## 3. Section 300g-1(b)(1)(B)(ii)(III)

The third and fourth uses of "determination to regulate" appear in the provision stating that EPA "may make a *determination to regulate* a contaminant that does not appear on a list under clause (i) if the *determination to regulate* is made pursuant to subclause (II)." *Id.* § 300g-1(b)(1)(B)(ii)(III) (emphasis added). This provision gives EPA discretion to regulate a contaminant that is not on the list of candidate contaminants established by section 300g-1(b)(1)(B)(i), provided the Act's criteria for regulation are satisfied. However, Congress clarified in section 300g-1(b)(1)(B)(iii) that, whether or not a contaminant is on the candidate list, "[e]ach document setting forth the determination for a contaminant under clause (ii) shall be available for public comment at such time as the determination is

12

published." EPA agrees that, by requiring public comment, section 300g-1(b)(1)(B)(iii) "makes clear that it refers to a preliminary determination." EPA Mot. 14. Thus, this provision ensures that any "[d]etermination to regulate" under section 300g-1(b)(1)(B)(ii) must include both a preliminary determination with opportunity for comment and a final determination. Taken in this context, the two uses of "determination to regulate" in section 300g-1(b)(1)(B)(ii)(III) are best interpreted to mean that EPA may undertake the determination to regulate process, including both a preliminary and final determination, for any contaminant not on the candidate list.

### 4.    Section 300g-1(b)(1)(E)

These four uses of "determination to regulate" inform the interpretation of the fifth and sixth uses, which appear in the second sentence of section 300g-1(b)(1)(E), the provision at issue here. In relevant part, the first and second sentences of that provision read in full:

> For each contaminant that the Administrator determines to regulate under subparagraph (B), the Administrator shall publish maximum contaminant level goals and promulgate, by rule, national primary drinking water regulations under this subsection. The Administrator shall propose the maximum contaminant level goal and national primary drinking water regulation for a contaminant not later than 24 months after the *determination to regulate* under subparagraph (B), and may publish such proposed regulation concurrent with the *determination to regulate*.

13

*Id*. § 300g-1(b)(1)(E) (emphases added). In the second sentence, "determination to regulate under subparagraph (B)" refers to section 300g-1(b)(1)(B)(ii), which is the portion of subparagraph (B) that Congress labeled "Determination to regulate." As discussed above, section 300g-1(b)(1)(B)(ii) establishes the full process, including preliminary and final determinations, so the cross-reference in the second sentence of section 300g-1(b)(1)(E) means the entire process. And, to maintain consistent meaning, the second use of "determination to regulate" in section 300g-1(b)(1)(E) likewise is best interpreted as meaning the entire process described in section 300g-1(b)(1)(B)(ii).

A close reading of section 300g-1(b)(1)(E) confirms this interpretation. The first sentence of section 300g-1(b)(1)(E) establishes that EPA's duty to set a Goal and Standard attaches only when EPA completes the process under subparagraph (B)(ii) and affirmatively "determines to regulate" a contaminant.

The second sentence of section 300g-1(b)(1)(E) addresses the timing for proposed Goals and Standards. The first clause, that EPA must propose a Goal and Standard "not later than 24 months after the determination to regulate under subparagraph (B)," *id.* § 300g-1(b)(1)(E), "provides an enforceable 24-month deadline" and "identifies when [the Act's] deadline begins to run." 89 Fed. Reg. at 32,541. But the first clause does not address or limit how early EPA can propose a Goal and Standard. Instead, the second clause clarifies that EPA "may publish such

14

proposed regulation concurrent with the determination to regulate," 42 U.S.C. § 300g-1(b)(1)(E), which is the clause that is central to EPA's motion. For two key reasons, this clause is best interpreted to mean that EPA may publish and seek comment on the proposed Goal and Standard concurrent with the determination to regulate process.

First, as discussed above, all other five uses of "determination to regulate" in section 300g-1 are best interpreted to refer to the process established in section 300g-1(b)(1)(B)(ii). For consistency, the sixth use of this phrase should be "presumed to have the same meaning." *Robers*, 572 U.S. at 643 (citation modified). Thus, the full meaning of the second sentence of section 300g-1(b)(1)(E) is that EPA may publish the proposed Goal and Standard as early as when it publishes the preliminary determination (the first step in the regulatory determination process) and no more than 24 months after the final determination (the last step in the regulatory determination process).

Second, Congress used the terms "simultaneous" or "simultaneously" five times in section 300g-1 but used "concurrent with" only once, in section 300g-1(b)(1)(E). *See* 42 U.S.C. § 300g-1(a), (a)(3), (b)(8), (b)(13)(F) (requiring EPA to

propose, publish, or promulgate various actions simultaneously).[1] The Court

should "presume differences in language like this convey differences in meaning."

*Wisc. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) (citation modified).

While both "simultaneous" and "concurrent" can mean "occurring at the same

time," only "concurrent" has an additional meaning of "running parallel."

*Compare Simultaneous*, Merriam-Webster Dictionary, http://merriam-

webster.com/dictionary/simultaneous (last visited Sept. 25, 2025) ("existing or

occurring at the same time: exactly coincident"), *with* Concurrent, Merriam-

Webster Dictionary, https://www.merriam-webster.com/dictionary/concurrent (last

visited Sept. 25, 2025) ("operating or occurring at the same time" or "running

parallel" or "acting in conjunction"); *see also EMC Corp. v. Hewlett-Packard Co.*,

No. 00-cv-40188-NMG, 2003 WL 25782750, at *19 (D. Mass. Sept. 12, 2003)

("The term 'concurrent' is defined as 'running parallel' and 'occurring, arising, or

operating at the same time often in relationship, conjunction, association, or

cooperation.'" (quoting *Webster's Third International Dictionary* 472 (1981))). To

give independent meaning to the unique word choice in section 300g-1(b)(1)(E),

the best reading is that Congress meant "running parallel with." Thus, "concurrent

---

[1] Congress also used "simultaneous" or "simultaneously" in other sections of the
Act. 42 U.S.C. §§ 300h-2, 300j-6, 300j-7, 300j-19b. "Concurrent with" appears
only in section 300g-1(b)(1)(E).

16

with" indicates that section 300g-1(b)(1)(E) allows the Goal- and Standard-setting process to run in parallel with the regulatory determination process, not just that EPA may publish two discrete actions at the same time.

### 5.    EPA's and Petitioners' interpretation is not the best reading of the Act

Petitioners' and EPA's alternative interpretation, that "determination to regulate" in section 300g-1(b)(1)(E) consistently means "final determination to regulate," is not the best reading for at least three reasons. *Contra* EPA Mot. 12-16. First, interpreting "determination to regulate" to mean "final determination" does not work in all six uses of "determination to regulate." For example, reading "determination to regulate" to mean "final determination" in the section 300g-1(b)(1)(B)(ii) heading does not make sense because the following subparagraph explicitly addresses both the preliminary and final determinations and section 300g-1(b)(1)(B)(iii) requires all determinations under clause (b)(1)(B)(ii) to include a preliminary determination "available for public comment." Similarly, reading section 300g-1(b)(1)(B)(ii)(II) to refer only to the final determination ignores that the criteria provided by Congress apply equally to preliminary determinations. EPA's and Petitioners' interpretation is like arguing that, in a contract that includes a multi-step dispute resolution process under the heading "Dispute Resolution," subsequent references to "Dispute Resolution" refer only to

the final resolution that results from the dispute resolution process, rather than to the entire process.

Second, EPA's and Petitioners' interpretation does not even attempt to give meaning to Congress's unique use of "concurrent with" in section 300g-1(b)(1)(E). Their interpretation assumes that Congress was sloppy and that "concurrent with" has the same meaning as "simultaneously with." The best reading of the statute ascribes different meanings to these different terms.

Third, EPA and Utility Petitioners fail to show that their interpretation is necessary to avoid surplusage. *Contra* EPA Mot. 15; Utility Br. 29. EPA now argues that "concurrent with" must be interpreted to create "a very specific window in which a regulation may be proposed" to avoid making that clause surplusage. EPA Mot. 15. That general concept may be sound, but it does not imply that "concurrent with" must mean concurrent with the final determination, as EPA now argues. Interpreting it to mean concurrent with the determination to regulate process equally specifies the earliest time when EPA can propose a Goal and Standard and avoids surplusage.

In sum, Petitioners' and EPA's statutory interpretation is not the "single, best meaning" of section 300g-1(b)(1)(E), and, having reversed its position on this issue, the unpersuasive interpretation in EPA's motion deserves no special weight. *Loper Bright*, 603 U.S. at 388, 394, 400.

18

### III.    Even If There Were a Procedural Error, It Was Harmless

Even if EPA had committed procedural error, which it did not, that error was harmless because the public had an opportunity to comment on the Determinations, Goals, and Standards. Intervenors Br. 11-13. The Court is not bound by EPA's newly professed waiver of this argument and should follow the APA, which instructs that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *City of Waukesha*, 320 F.3d at 246. Accordingly, this Court has previously held an agency's error harmless where the agency waived any harmless error argument by failing to raise it. *See, e.g., First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000); Brief of Appellee CFTC, No. 99-1098, 1999 WL 34835203 (D.C. Cir. Nov. 9, 1999).

EPA does not dispute that any procedural error was harmless as to the Determinations. *See* EPA Mot. 17 (arguing only that "the error was not harmless as to the Goals and Standards" (capitalization omitted)). And with respect to the Goals and Standards, as EPA explained in the Rule and its merits brief, concurrently publishing the proposed Determinations and Standards provided stakeholders with *more* information earlier in the process, promoting public engagement rather than defeating it. EPA Br. 37; 89 Fed. Reg. at 32,542.

EPA's argument that the public was harmed because they supposedly are entitled to separate, sequential comment opportunities on proposed Determinations

19

and Standards identifies no actual prejudice. EPA Mot. 18-19. Contrary to EPA's claim that the preliminary and final Determinations were "markedly different," the only difference is that EPA published proposed regulatory determinations for four, and then issued final regulatory determinations for three, of the Index PFAS individually. EPA Mot. 18. Stakeholders thus had the opportunity to comment on all Determinations, Goals, and Standards that EPA ultimately finalized.

Utility Petitioners' claim of harm concerning occurrence data is a red herring. Utility Pet'rs' Resp. in Supp. of Mot. for Partial Vacatur 16-19, Dkt. No. 2137385. They too claim no harm respecting the Determinations, arguing only that a second comment period would have enabled them to comment on "the interplay" between occurrence data and EPA's cost-benefit analysis, which they allege "is relevant to determining the Goal and [Standard]"—not Determinations. *Id.* at 17. But this "interplay" is irrelevant to Goals, which reflect the level at which contaminants may cause health harm, not occurrence or costs and benefits. EPA Br. 6. And they cannot show harm by insinuating that such "interplay" could bear on Standards because the Act constrains EPA's authority to even consider cost-benefit analyses in setting Standards. Intervenors' Br. 34-37. Further, EPA's consideration of additional occurrence data during the comment period was appropriate and required no additional public comment because the final Rule is a

20

logical outgrowth of the proposal, *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001), which Petitioners do not dispute.

EPA's reliance on cases in which agencies finalized rules without any notice-and-comment period is misplaced. *See Sprint Corp. v. FCC*, 315 F.3d 369, 374, 376-77 (D.C. Cir. 2003); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96-97 (D.C. Cir. 2002); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C. Cir. 1988), discussed in EPA Mot. 17, 19. Because EPA did not "entirely fail[] to comply with notice-and-comment requirements," Petitioners were prejudiced only if they can demonstrate that "they would have submitted additional, different comments that could have invalidated the rationale" for the Goals and Standards. *City of Waukesha*, 320 F.3d at 246 (citation modified); *see also Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail v. Fed. R.R. Admin.*, 40 F.4th 646, 664-65 (D.C. Cir. 2022). They have not made this showing.

## IV. Even If There Were a Procedural Error and It Were Not Harmless, Vacatur Is Not Justified

EPA's argument fails at the outset because, "[a]s a general rule, [the Court does] not vacate regulations when doing so would risk significant harm to the public health or the environment." *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019). Further, EPA fails to justify its request for relief under the two-part standard in *Allied-Signal v. NRC*, which considers "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and

21

the disruptive consequences of an interim change that may itself be changed." 988

F.2d 146, 150-51 (D.C. Cir. 1993) (citation modified). Ultimately, "resolution of

the question [of whether to vacate] turns on the Court's assessment of the overall

equities and practicality of the alternatives." *Am. Great Lakes Ports Ass'n v.*

*Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018) (citation modified), *aff'd sub nom.*

*Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020). As

discussed below, none of the relevant considerations supports vacatur.

### A. Vacatur Would Threaten Public Health

This Court should not vacate the Index PFAS provisions because doing so

would risk significant public health harm. *See North Carolina v. EPA*, 550 F.3d

1176, 1177-78 (D.C. Cir. 2008). As EPA determined just last year, exposure to the

Index PFAS presents risks of adverse liver, kidney, and cholesterol effects and

harm to the reproductive, immune, endocrine, and hematological systems. EPA Br.

9-12. Vacating the Index PFAS Standards would inflict these risks on tens of

millions of people. For example, EPA estimated that 300-700 water systems

serving 9-18 million people likely exceed the Hazard Index standard. *See* EPA,

*Occurrence and Contaminant Background Support Document for the Final PFAS*

*National Primary Drinking Water Regulation* 250 ex. 10-5 (2024),

https://www.epa.gov/system/files/documents/2024-04/updated-technical-support-

document-on-pfas-occurrence_final508.pdf. Further, if the Court were to vacate

22

the Index PFAS Determinations—despite EPA's failure to identify any legal error in their promulgation or associated harm, *see supra* Points II.A, III, there is no assurance that EPA would ever regulate the Index PFAS, let alone within the time in which the Rule requires compliance.

Thus, vacating the Index PFAS provisions "would at least temporarily," and perhaps in the long-term or permanently, "defeat the enhanced protection of the environmental values covered by the EPA rule at issue," which justifies denying vacatur. *North Carolina*, 550 F.3d at 1177-78 (citation modified) (denying vacatur on this basis despite finding "more than several fatal flaws in the rule" (citation modified)); *see also Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt*, 852 F. Supp. 32, 42 (D.D.C. 1994) (denying vacatur of threatened species designation despite errors because removing associated protections during short reevaluation period would "destabilize a delicate structure of regulations and incentives[] designed … to protect … the entire coastal sage scrub habitat community").

## B. The Alleged Error Is Not Serious

Even if the Court were to determine that EPA made a procedural error in promulgating the Index PFAS Goals and Standards, the alleged error is not serious. This factor generally counsels against vacatur where, as here, any "defect … is likely curable," and the agency would be "free to reinstate the original result."

23

*Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199-200 (D.C. Cir. 2009)
(citation modified). Courts often leave defective rules in place if there is a
significant possibility the agency could reach the same result after correcting its
error. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032,
1051 (D.C. Cir. 2021) (explaining that "seriousness of a deficiency … is
determined at least in part by whether there is a significant possibility that the
agency may find an adequate explanation for its actions" after correcting
deficiency (citation modified)); *Fox Television Stations v. FCC*, 280 F.3d 1027,
1048 (D.C. Cir. 1993) (opting not to vacate because court could not "say with
confidence that the Rule is likely irredeemable"), *modified on reh'g*, 293 F.3d 537
(D.C. Cir. 2002); *Allied-Signal*, 988 F.2d at 151.

In contrast, courts deem an error serious when an agency omits "a major
procedural step." *Standing Rock Sioux Tribe*, 985 F.3d at 1052 (identifying failure
to prepare required environmental impact statement as omitting major procedural
step); *see also Heartland*, 566 F.3d at 199 (identifying failure to provide for *any*
public notice or comment and failure to provide a discernable basis and purpose for
a rule as fundamental flaws that would usually require vacatur).

Even assuming for the sake of argument that EPA violated the Act by
providing for concurrent public comment on the Index PFAS Determinations and
Standards, that error is not serious. First, EPA did not "forgo a major procedural

24

step in its path to its ultimate action." *Standing Rock Sioux Tribe*, 985 F.3d at 1052. To the contrary, this Court has held that a procedural error affecting the timing of notice and comment does not support vacatur, where, as here, interested parties had an opportunity to comment on the matter before the agency took final action. For example, this Court characterized the Department of Interior's violation of Clean Air Act notice requirements before issuing a conformity determination as a "defect[] [with] relative insignificance" where notice and opportunity to comment were afforded through other means. *Stand Up for Cal.! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018) (holding district court "acted well within its discretion" in denying vacatur); *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (declining to vacate rule where petitioner "ha[d] actual notice and was able to submit its views to the agency prior to the challenged action"). EPA's argument that it committed a serious error by purportedly depriving the public of the opportunity to comment "exclusively" on the Determinations and Standards in separate comment periods, EPA Mot. 21, lacks any support in the caselaw.

Second, the alleged error is curable and EPA would be "free to reinstate" the Index PFAS provisions after additional comment. *Heartland*, 566 F.3d at 198-99 (citation modified). In its brief, EPA vigorously defended the substance of the Index PFAS provisions and the underlying data and analysis. EPA Br. 25-29, 38-

25

65, 74-92. And, precisely because a robust notice-and-comment process occurred here, EPA considered more than 120,000 comments addressing all portions of the Rule, including hundreds of pages of comments from Petitioners. EPA, Responses to Public Comments, at xv (2024), https://www.epa.gov/system/files/documents/2024-04/pfas-comment-response-document_final-508_v2.pdf; *see* Utility Br. SA4-5 (Petitioner AWWA attesting its comments reflected "an extensive review of EPA's legal and policy justifications, health risk reduction and cost analysis, and associated materials" and included "a cost modeling report … ; a compilation of case studies … ; and an analysis of EPA's toxicology analyses"). Against this backdrop, there is at least a "significant possibility" that EPA could reach the same substantive result following additional comment. *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation modified). On these facts, this is reason enough to deny EPA's motion. *See, e.g.*, *Fox Television*, 280 F.3d at 1048-49 (holding vacatur unwarranted because agency could potentially justify action on remand, even though challenged action was arbitrary and contrary to statute, and disruption from vacatur would likely be minimal).[2]

---

[2] EPA's claim that the alleged procedural defect is "serious" because EPA must "essentially restart the regulatory process" to cure it is spurious. EPA Mot. 20. As explained, EPA does not even allege, let alone establish, any statutory violation in the Determinations' promulgation nor any harm from that process. *See supra* Points II.A, III.

Indeed, unless it gets the vacatur order it seeks, there is more than a "significant possibility" that EPA may reach the same substantive result because the Act forbids EPA from rescinding or weakening the Index PFAS Determinations or Standards. *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation modified); *see* 42 U.S.C. § 300g-1(b)(9) (prohibiting EPA from weakening or rescinding Standards); *NRDC*, 67 F.4th at 404 (holding that Act prohibits rescission of Determinations); EPA Mot. 20-21. EPA tries to contort these constraints on its authority into justifications for vacatur. EPA Mot. 20-21. But EPA fails to confront that vacatur would accomplish an end run around Congress's purposeful prohibitions against agency flip-flopping on protections for the nation's drinking water. *Id*. EPA's frustration with these statutory prohibitions does not make the alleged procedural error "serious" under *Allied-Signal* and its progeny. Moreover, these statutory restrictions on EPA's authority put a Congressional thumb on the scale against vacatur, because vacatur would allow EPA to accomplish through a Court order what the Act bars EPA from doing itself.

## C. Vacatur Would Be Disruptive

Vacatur of the Index PFAS provisions would have substantial disruptive consequences. *Allied-Signal*, 988 F.2d at 150-51.

First, vacatur may produce an interim change that itself would be changed, as EPA could reissue the Index PFAS Standards after additional notice and

27

comment. *See supra* Point IV.B. Indeed, unless the Court vacates the Determinations, vacating the Standards necessarily would produce an interim change with subsequent changes forthcoming because EPA would be statutorily obligated to promulgate new regulations for the Index PFAS by mid-2028. *See* 42 U.S.C. § 300g-1(b)(1)(E) (requiring final Standards no more than 51 months after Determinations). Further, even temporary vacatur of the Standards would disrupt health protections for millions of people, potentially for years. *See supra* Point IV.A; *Am. Great Lakes*, 301 F. Supp. 3d at 105 (denying vacatur as too disruptive where it would "dictate a substantive outcome based on a procedural error" because, on remand, agency could not reinstate rule with same effective date (citation modified)).

Moreover, vacatur would be disruptive for many entities that have taken action in reliance on the Rule. These include state agencies that have conformed their regulations to the Rule as the Act requires[3]; water systems that have invested

---

[3] *See, e.g.,* Wash. Admin. Code § 246-290-310(7)(d) (adopting Index PFAS Standards in state law); *Group A Public Water Supplies – PFAS Rulemaking*, Wash. State Dep't of Health, https://doh.wa.gov/community-and-environment/drinking-water/regulation-and-compliance/rules/group-public-water-supplies-pfas-emergency-rule (last visited Sept. 25, 2025) (describing rulemaking processes to harmonize state law with EPA's Rule); 42 U.S.C. § 300g-2(a)(1) (requiring states to adopt Standards as stringent as EPA's as condition to exercising primary enforcement authority under the Act).

substantial resources to comply with the Rule[4]; and organizations like the National Sanitation Foundation ("NSF"), an international organization whose certifications for drinking water components are incorporated into state laws, which has updated its criteria to align with the Rule.[5] Courts have regularly found such widespread consequences, even those limited to one sector, to weigh against vacatur. *See, e.g., Healthy Gulf v. FERC*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) (concluding that disruption of individual company's "construction plans and commercial operations" weighed against vacatur); *Allied-Signal*, 988 F.2d at 151 (deeming consequence of refunding fees that agency would be unable to recover under later-enacted rule disruptive and denying vacatur).

---

[4] *See, e.g., Multi-Year, $60 Million Eastside Water Project to Start September 8*, City of Kalamazoo (Sept. 4, 2025), https://www.kalamazoocity.org/News-articles/Multi-Year-60-Million-Eastside-Water-Treatment-Water-Main-Project-to-Start-September-8 (describing "major infrastructure project" to, among other objectives, "ensur[e] compliance with new federal PFAS regulations"); *Yardley Water System Expected to Meet 2029 U.S. EPA PFAS Standards by End of 2025*, Penn. Am. Water (May 9, 2025), https://www.amwater.com/press-room/press-releases/pennsylvania/yardley-water-system-expected-to-meet-2029-us-epa-pfas-standards-by-end-of-2025 (announcing $7.75 million investment to "help[] ensure treated water will meet [EPA] standards" for PFAS).
[5] *How Does NSF/ANSI/CAN 61 Align with the U.S. EPA Regulations for PFAS?*, NSF (Feb. 5, 2025), https://www.nsf.org/knowledge-library/how-nsf-ansi-can-61-align-with-us-epa-pfas-regulations.

## V.    Due to EPA's Changed Position, the Court Should Grant Intervenors Leave to File a Revised and Expanded Brief

EPA's changed position, coupled with the likelihood that EPA's final brief will abandon more than half of its proof brief, prejudices Intervenors' ability to defend their interests. To mitigate that prejudice and ensure that the Court has complete briefing on all contested issues, Intervenors move for leave to file a revised and expanded brief of 18,200 words.[6]

EPA filed its proof brief defending the Rule in all respects in December 2024, followed by Intervenors' proof brief in January 2025. In May 2025, before briefing was complete and while the case was in abeyance, EPA announced its "intent to rescind the regulations and reconsider the regulatory determinations for" the Index PFAS. *See supra* p.4. Consistent with that statement, EPA's declaration

---

[6] Intervenors have established, and no party challenged, their standing to defend all aspects of the Rule. *See* Cmty. Grps. Intervention Mot. 18-20; *see also id.* at 15-18; NRDC Intervention Mot. 9-15. Further, Intervenors are entitled to defend the provisions of the Rule that EPA is no longer defending. *See, e.g.*, *Global Tel\*Link v. FCC*, 866 F.3d 397, 402, 407 (D.C. Cir. 2017) (adjudicating petition for review and considering defenses of agency action abandoned by agency where intervenor "continue[d] to press the points that have been abandoned by the [agency]"); *Nat'l Wildlife Fed. v. Lujan*, 928 F.2d 453, 456 n.2 (D.C. Cir. 1991) (allowing defendant-intervenors to appeal lower court ruling where agency defendant declined to appeal). And no claim in this case is moot because the Rule is still in effect. *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (holding case was not moot even where government intended to replace challenged rule and would not enforce it in the interim).

30

avers that "EPA no longer seeks to defend the portions of the rule regarding" the Index PFAS. Browne Decl. ¶ 3, Dkt. No. 2134523.

EPA's decision to cease defending the Index PFAS provisions will severely prejudice Intervenors unless Intervenors are allowed to supplement their brief. D.C. Circuit Rule 28(d)(2) required Intervenors to "avoid repetition of facts or legal arguments made in the principal [EPA] brief." To comply with that rule, Intervenors' brief adopted EPA's proof brief in full and cross-referenced EPA's legal and factual arguments more than thirty times. *See* Intervenors Br. 2 & n.2, 10-11, 13-14, 16-17, 19, 22-24, 30, 32-36, 38-41, 43-44, 46. Given EPA's withdrawal and abandonment of substantial arguments in its proof brief upon which Intervenors relied, Intervenors' arguments will be incomplete, and potentially incoherent, without an opportunity for Intervenors to adjust their brief.

Intervenors' reliance on EPA's brief was also reasonable given the parties' agreement to use a deferred appendix. *See* Statement of Intent to Use Deferred Joint Appendix, Dkt. Nos. 2063367, 2064230. In doing so, all parties were bound by Federal Rule of Appellate Procedure 30(c)(2)(B), which provides that, except for adding "references to the pages of the appendix" and "the correction of typographical errors, no other changes may be made to the brief." At the time Intervenors filed their proof brief, Rule 30(c)(2)(B) assured Intervenors that the

31

substance of EPA's brief—and the viability of Intervenors' adoption of and cross-references to EPA's brief—would not change between the proof and final briefs.

Now that EPA has declared that it "no longer seeks to defend the portions of the [R]ule regarding" the Index PFAS, Browne Decl. ¶ 3, Intervenors are the only parties defending those aspects of the Rule. But Intervenors' arguments on these issues in their proof brief are deeply intertwined with EPA's previously filed arguments. As one example (of many), Petitioners allocated about 19 pages and more than 4,200 words to their statutory interpretation arguments that EPA could not propose the Index PFAS Determinations and Standards at the same time. Utility Br. 18-32 (3,441 words); Industry Br. 34-37 (840 words).[7] EPA's response spanned about 10 pages and more than 1,900 words. EPA Br. 29-38. To avoid repetition consistent with the Court's rules, Intervenors allocated just two pages and 360 words of their proof brief to this issue, relying entirely on the statutory interpretation arguments in EPA's brief and focusing on an alternative harmless error argument. Intervenors Br. 11-13.

Similarly, Petitioners' opening briefs allocated about 33 pages and more than 7,600 words to arguments about whether the evidence in the administrative

---

[7] Word counts for other parties' briefs were calculated by Microsoft Word after converting the filed proof briefs from PDF to Word format. The conversion caused some loss of formatting and may have inadvertently introduced minor word count changes, so the word counts are approximate.

record justifies the Index PFAS provisions. Utility Br. 40-53 (3,089 words); Industry Br. 39-60 (4,592 words). EPA's proof brief included about 47 pages and more than 9,700 words on these issues in its Statement of the Case and Argument. EPA Br. 8-14 (1,133 words), 38-65 (5,964 words), 78-92 (2,644 words). By contrast, Intervenors allocated about 12 pages and about 2,370 words to these issues. Intervenors Br. 13-22 (1,829 words), 29-32 (538 words). Moreover, Intervenors relied entirely on their adoption of EPA's proof brief arguments for some of these record-based issues, such as responding to Industry Petitioners' extensive arguments regarding the Standard for HFPO-DA. *See* Industry Br. 52-60 (1,815 words); EPA Br. 81-92 (2,180 words).

All told, Petitioners' briefs dedicated nearly 15,000 words to arguments specific to the Index PFAS provisions.[8] Similarly, EPA's brief allocated more than 14,000 words to issues specific to the Index PFAS.[9] By contrast, Intervenors' brief

---

[8] Utility Petitioners' brief includes at least 8,279 words on these issues (Argument sections I (3,441 words), II (1,749 words), and III (3,089 words)), and Industry Petitioners' brief includes at least 6,664 words on these issues (Argument section I (3,148 words) and II (3,516 words)), for a total of at least 14,943 words among all the Petitioners.

[9] EPA's brief includes at least 14,316 words on these issues in the Statement of the Case section II (1,133 words) and Argument sections I (2,939 words), II (5,964 words), and III(C)-(F) (4,280 words).

33

included just 4,632 words of argument on issues specific to the Index PFAS, with extensive cross-references to EPA's brief.[10]

EPA's decision to stop defending the Index PFAS provisions means that EPA has abandoned more than 14,000 words of its proof brief—more than half of the brief. But Intervenors relied on all of EPA's proof brief when deciding which arguments to supplement in their proof brief and adopted all of EPA's proof brief.

To allow Intervenors a reasonable opportunity to brief the Index PFAS issues fully in the absence of EPA's arguments, Intervenors respectfully request leave to file a revised and expanded brief of 18,200 words, which would expand Intervenors proof brief by 9,100 words (twice the length of a typical intervenor brief). A brief of this length would maintain the standard ratio between the word limits for an intervenor's brief and the word limits for the principal parties' briefs because the Petitioners filed two full-length opening briefs and EPA filed a double-length response brief. And the additional 9,100 words is similar to, and slightly less than, the approximately 9,700-word difference in length between the sections of EPA's and Intervenors' proof briefs that address Index PFAS issues.

---

[10] Intervenors' brief addresses these issues in Argument sections I (2,573 words) and III (2,059 words).

Allowing Intervenors to respond fully to Petitioners' arguments regarding the Index PFAS provisions will assist the Court. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (affirming courts generally "rely on the parties to frame the issues for decision"). Moreover, no other party would be prejudiced. Petitioners would have a full opportunity to respond to Intervenors' revised brief in their yet-to-be-filed replies. And granting Intervenors an extra 9,100 words, in response to EPA's abandonment of about 14,000 words of its proof brief, means that Petitioners would reply to about 5,000 fewer total words from EPA and Intervenors, so there is no need to adjust the length of the reply briefs.

## CONCLUSION

For the foregoing reasons, the Court should deny EPA's motion for partial vacatur and grant Intervenors leave to file a revised and expanded brief of 18,200 words.

DATED: September 26, 2025          Respectfully submitted,

/s/Katherine K. O'Brien            /s/Jared J. Thompson
KATHERINE K. O'BRIEN               JARED J. THOMPSON
Earthjustice                       Natural Resources Defense Council
P.O. Box 2297                      40 West 20th Street
South Portland, Maine 04116        New York, NY 10011
(212) 284-8036                     (202) 513-6249
kobrien@earthjustice.org           jared.thompson@nrdc.org


SUZANNE NOVAK                       KAREN CHEN
HILLARY AIDUN                       Natural Resources Defense Council
Earthjustice                       111 Sutter Street, 21st Floor
48 Wall St., 15th floor            San Francisco, CA 94104
New York, New York 10005           (415) 875-8261
(212) 823-4981                     kchen@nrdc.org
(212) 284-8040
snovak@earthjustice.org            *Counsel for Natural Resources*
haidun@earthjustice.org            *Defense Council*


*Counsel for Buxmont Coalition*
*for Safe Water, Clean Cape Fear,*
*Clean Haw River, Concerned*
*Citizens of WMEL Water Authority*
*Grassroots, Environmental Justice*
*Task Force, Fight for Zero,*
*Merrimack Citizens for Clean Water,*
*and Newburgh Clean Water Project*

36

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that the foregoing opposition and cross-motion contains 7,793 words, excluding the items listed in Fed. R. App. P. 27(d)(2)(A), and was composed in Times New Roman font, 14-point. The opposition and cross-motion complies with applicable word limits, type-volume and typeface requirements. Fed. R. App. P. 32(a)(5)-(6); Fed. R. App. P. 27(d)(1); D.C. Cir. R. 27(c).

DATED: September 26, 2025          */s/Katherine K. O'Brien*
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, Maine 04116
(212) 284-8036
kobrien@earthjustice.org

37

## CERTIFICATE OF SERVICE

I certify that on this 26th day of September, 2025, the foregoing document

was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals

for the D.C. Circuit, which will provide electronic notice to all counsel of record.

DATED: September 26, 2025          */s/Katherine K. O'Brien*
                                    Katherine K. O'Brien
                                    Earthjustice
                                    P.O. Box 2297
                                    South Portland, ME 04117
                                    (212) 284-8036
                                    kobrien@earthjustice.org